UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TREVIS D. BROWN,

                Plaintiff,            Case No. 11-cv-11535
                                            Honorable George Caram Steeh
                                            Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]**

      Plaintiff Trevis D. Brown ("Brown") brings this action pursuant to 42 U.S.C. §405(g),

challenging a final decision of Defendant Commissioner of Social Security ("Commissioner")

denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") benefits under the Social Security Act (the "Act"). Both parties have filed

summary judgment motions [8, 11], which have been referred to this court for a Report and

Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.**     **RECOMMENDATION**

      For the reasons set forth below, the court finds that the Administrative Law Judge

("ALJ") erred in failing to give proper weight to the opinion of Brown's treating physician, Dr.

Gary Roome. Thus, the ALJ's conclusion that Brown could perform a significant number of

jobs in the national economy is not supported by substantial evidence. Accordingly, the court

recommends that the Commissioner's Motion for Summary Judgment [11] be DENIED,

Brown's Motion for Summary Judgment [8] be GRANTED IN PART to the extent it seeks

remand and DENIED IN PART to the extent it seeks an award of benefits and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

On November 28, 2006, Brown filed an application for DIB and SSI, alleging disability beginning on April 1, 2005. (Tr. 134-40). The claim was denied initially on December 29, 2006. (Tr. 72-76). Thereafter, Brown filed a timely request for an administrative hearing, which was held on June 9, 2009, before ALJ John Pope. (Tr. 35-65). Brown (represented by attorney Timothy MacDonald) testified at the hearing, as did vocational expert ("VE") Edward Pagella. (Tr. 41-64). On July 16, 2009, the ALJ found that Brown was not disabled. (Tr. 23-34). On February 23, 2011, the Appeals Council denied review. (Tr. 1-4). Brown filed for judicial review of the final decision on April 11, 2011 [1].

### B.    Background

#### 1.    Disability Reports

In a November 28, 2006 disability field office report, Brown reported that his alleged onset date was April 1, 2005. (Tr. 146). The claims examiner noted that Brown had trouble sitting, standing, and concentrating, and that he had to "keep getting up and down from chair and stretching his back," "would occasionally wince in pain," and "would sometimes have to stop and take a deep breath from interview." (Tr. 148).

In an undated disability report, Brown indicated that his ability to work was limited by a lower back injury, and that he suffers from constant back pain. (Tr. 151). Brown reported being seen by several doctors regarding this back condition. (Tr. 153-58). He also reported taking Lisinopril and Norvasc (for high blood pressure) and Morphine, Nortriptyline, and Vicodin (for

2

pain).  (Tr. 158).  He further reported that MRI/CT scans were performed on his lower back in April 2005, August 2005, February 2006, and August 2006.  (Tr. 159).  Brown stated that his back condition first interfered with his ability to work on October 15, 2004, and that he became unable to work on April 1, 2005.  (Tr. 151).  Brown has not worked since May 15, 2006, when he claims his employer took him off work because he was unable to do the job.  (*Id.*).

Brown completed high school and one year of college.  (Tr. 159).  He also had some training in "electronic engineering," although he did not complete the program.  (*Id.*).  Prior to stopping work, Brown worked as a material handler (forklift operator) from 1999-2006.  (Tr. 152).  In that job, he unloaded semi-trucks with a forklift, and he was required to walk, sit, climb, stoop, crouch, reach, and handle both large and small objects several hours per day.  (*Id.*).  He was frequently required to lift twenty pounds, and occasionally had to lift up to seventy pounds.  (Tr. 153).

In a function report dated December 13, 2006, Brown reported that he lives in a house with his family.  (Tr. 165).  He indicated that he wakes up at 6:30 a.m. each day and takes a pain pill.  (*Id.*).  He drives his daughter to school, returns home, and then drives his son to school and his wife to work (at the same place).  (*Id.*).  Once he is done with this, he returns home where he lies down and either sleeps, watches television, or makes some telephone calls.  (*Id.*).  Later in the day, he picks up his daughter from school and his wife and son from work/school, before returning home to eat dinner and take more medicine.  (*Id.*).  Brown stated that he can no longer play sports or engage in prolonged standing, driving, walking, or sitting.  (Tr. 166).  He also asserted that his back pain wakes him up two or three times a night.  (*Id.*).  Brown indicated that he has some difficulty with personal care – he dresses slowly, taking care not to twist, bend or turn, and sometimes needs help lowering himself into the tub.  (*Id.*).  He is able to prepare some

simple meals for himself (such as sandwiches or frozen dinners).  (Tr. 167).  Brown does some light cleaning, but he pays someone to cut the grass, do yard work, and make necessary repairs around the house.  (*Id.*).  Brown reported that he goes outside two or three times a day, he is able to drive, and that he goes on short outings to the grocery store.  (Tr. 168).  Brown spends most of his time watching television (approximately 8-10 hours per day) or reading (1-2 hours per day).  (Tr. 169).  He gets together with friends daily, and attends church occasionally.  (Tr. 169-70).

When asked to identify functions that were impacted by his condition, Brown checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing.  (Tr. 170).  He indicated that he cannot lift more than five pounds and that it is "very painful to bend, squat, kneel, prolong stand, sitting and walking."  (*Id.*).  He can walk for approximately one-quarter mile before it becomes painful.  (*Id.*).  Brown does not have problems with handling stress or changes in routine, but he does "yell a lot."  (Tr. 171).  He wears a back brace, which was prescribed in September 2005, to prevent him from twisting and bending too much.  (*Id.*).

In an undated disability appeals report, Brown reported that there had been no change in his condition since his last report.  (Tr. 189).  Since the time of his last report, he had received "SI injections" for his lower back at the University of Michigan Center for Interventional Pain, and he claimed to have seen a doctor for "emotional or mental problems that limit [his] ability to work."[1]  (Tr. 189-90).  He was continuing to take MS Contin, Nortriptyline, and Vicodin for pain, but again complained that he is in "constant pain" and that prolonged standing, walking, or sitting aggravates his back condition.  (Tr. 191-92).  In conclusion, he indicated:  "I am currently being subjected to different treatments and medicines to try to determine if my pain can be cured or subsided."  (Tr. 193).

---

[1] There is no evidence in the record that Brown ever saw a mental health professional.

### 2. *Plaintiff's Testimony*

At the June 9, 2009 hearing before the ALJ, Brown testified that he had worked as a forklift operator at Integra (Brighton) until April 1, 2005, when he went off work as a result of a work-related back injury.[2] (Tr. 43). When his back condition rendered him unable to return to work after two years, his employment with Integra was terminated. (*Id.*). Brown testified that he attempted to undergo a formal functional capacity evaluation as part of the workers' compensation process, but the evaluation could not be completed because he was in so much pain.[3] (Tr. 43-44).

Brown further testified that he is unable to work because of back pain (which radiates down his legs) and muscle spasms, saying, "My back locks up on me." (Tr. 44-45, 55). He also suffers from testicular pain, which started approximately two months prior to the hearing. (Tr. 45, 55). These conditions affect his ability to sit, as well as lift and carry items. (*Id.*). The pain worsens with physical activity, and he can lift nothing heavier than a gallon of milk without pain. (Tr. 56-57). He uses medication, heat, and ice in an attempt to reduce the pain. (Tr. 56). He can only stand or walk for ten minutes a day, and sitting for prolonged periods is painful as well. (Tr. 57-58).

Brown testified that he currently sees his primary care physician, Dr. Gary Roome, approximately once a month for bloodwork and medication refills. (Tr. 46). Before that, he treated with Dr. Mohamed Abuharaz, seeing him once a month for similar treatment. (Tr. 46-47). Brown has also treated with several specialists. He saw Dr. Vivekanand Palavali, a

---

[2] As set forth in greater detail below, there is conflicting evidence in the record about the cause of Brown's back injury in April of 2005. At different times, Brown has indicated that the injury occurred while driving a forklift at work and while lifting a suitcase at home. (Tr. 429).

[3] Brown's attorney commented on the record that he had not seen such an evaluation, and it is not included in the record. (Tr. 43-44).

neurologist, five or ten times between 2005 to 2008, and it was Dr. Palavali who performed an interdiscal electrothermal therapy ("IDET") procedure on Brown in November of 2005. (Tr. 47-48). He also saw Dr. James Culver, a pain management physician, for two series of injections in approximately 2006. (Tr. 48). In addition, he testified that he saw Dr. Rao, another pain management physician, for a series of injections in October of 2008. (*Id.*). And, since 2003, he has seen several physicians at the University of Michigan for pain management procedures, including sciatic nerve injections in 2007. (Tr. 48-49). Brown also testified that he has undergone physical therapy for approximately two months at a time, on three separate occasions. (Tr. 49). All of the physicians who treated Brown extended his leave from work, apparently believing he could not return to his job as a forklift operator. (Tr. 49-50). Brown testified that he takes several medications, including Alturim, Lisinopril, Neurontin, Elavil, and Cardia, none of which help his pain or produce side effects. (Tr. 50).

Brown testified that, on a typical day, he gets up at about 6:30 a.m., takes some medication, and then sees his son off to school.[4] (*Id.*). He then gets a heating pad and lies down on the bed or the couch until his son returns from school at 3:30 p.m. (Tr. 51). He does get up during the day to make himself a quick meal, but he primarily spends his days reading and watching television. (*Id.*). His wife arrives home at about 4:30 p.m. and cooks dinner; Brown eats dinner and then returns to his heating pad, before going to bed at 10:00 p.m. (Tr. 52). Brown testified that he can dress, groom, and bathe himself, and that he occasionally goes on a "short run" to the grocery store with his wife, where he leans on the cart. (Tr. 52-53). He does not do laundry, do the dishes, or sweep. (Tr. 53). Although he used to play a lot of sports, he

---

[4] On a December 13, 2006 function report, Brown indicated that he drove both his son and his daughter to school every day. (Tr. 165). At the hearing, however, he testified that he had not driven since 2005 because he has not had a valid driver's license. (Tr. 42, 58).

can no longer exercise because it aggravates his back.  (*Id.*).

Brown testified that he could not work at a full-time job, even if he could sit or stand and work at his own pace and not have to lift more than ten pounds, because of the severity of his back pain and because, in his words, "it's hard to concentrate when you hurting so bad."  (Tr. 59).  He testified that he spends six hours out of an eight hour day lying in bed or on the couch. (Tr. 60).  Brown further testified that neither the IDET procedure nor the series of injections have helped his back pain at all.  (*Id.*).

### 3.    *Medical Evidence*

The record contains a substantial amount of medical evidence regarding Brown's low back pain, as well as his diagnosis with and treatment for prostate cancer.  Because Brown does not challenge the ALJ's findings with respect to his prostate cancer on appeal, the court will primarily focus its attention on medical records relating to Brown's back injury.

### (a)    *Primary Care Physicians*

### (1)    *Dr. Mohamed Abuharaz*

On May 25, 2005, Brown saw Dr. Abuharaz for the first time and reported having had back pain for over a year, since he allegedly injured his back at work in January 2004.  (Tr. 461). Dr. Abuharaz noted that Brown had undergone an MRI of the lumbar spine on April 10, 2005. (Tr. 219).  The MRI revealed "mild discogenic and spondylotic changes" at L5-S1.  (Tr. 219, 461).  The MRI also showed changes at L4-L5, causing a mild to moderate narrowing of the neural foramina.  (Tr. 219).  Brown was doing physical therapy at the time and said that his pain was "much improved."  (Tr. 461).  On examination, there was tenderness over the lumbosacral area, especially on the right side, but Brown's straight leg raise test was negative, his reflexes were normal, and there were no motor or sensory deficits in the legs.  (*Id.*).  Brown was

7

prescribed Neurontin and was advised to continue physical therapy and to stay off work until that course of treatment was finished.  (*Id.*).[5]

On June 22, 2005, Brown saw Dr. Abuharaz and reported having been recently diagnosed with prostate cancer.  (Tr. 460).  He was stable on examination but did have tenderness across the lumbosacral area and muscle spasms.  (*Id.*).  His Neurontin was increased, and he also was placed on Skelaxin.  (*Id.*).  His sick leave was extended for three weeks until he completed physical therapy.  (*Id.*).

On July 18, 2005, Dr. Abuharaz noted that Brown was still having burning pain across the lumbosacral area, radiating down his left leg at times.  (Tr. 459).  Brown was advised to continue physical therapy, his Neurontin was increased, and Norvasc was added.  (*Id.*).  Dr. Abuharaz's notes indicate that Brown was supposed to return to work with restrictions in one week's time.  (*Id.*).

Brown was seen for a medication refill and follow-up for his back pain on August 23, 2005.  (Tr. 458).  On examination, he had moderate movement restriction at the lumbar area, but his straight leg raising test was negative.  (*Id.*).  The next week, on August 30, 2005, Brown was seen again and noted to have tenderness and muscle spasms.  (Tr. 456).  Dr. Abuharaz referred Brown to the Pain Management Center of Flint and started him on Zanaflex.  (*Id.*).  On September 22, 2005, Brown again saw Dr. Abuharaz, seeking more Vicodin, but he was not yet due for a refill.  (Tr. 455).  He returned on October 13, 2005, and reported continued burning back pain.  (Tr. 454).  He had tried three epidural shots at the Pain Management Center at that point, but said that these did not help his pain, nor did physical therapy.  (*Id.*).  Dr. Abuharaz

---

[5] Brown was seen by a urologist regarding his prostate cancer on May 31, 2005, and reported no complaints of back pain.  (Tr. 295-96).  In addition, on July 1, 2005, as a result of his prostate cancer, he had a total body scan performed, the findings of which were normal.  (Tr. 332).

discontinued Neurontin and placed Brown on Lyrica.  (*Id.*).  He also referred Brown to Dr. Palavali for a surgical evaluation.  (*Id.*).

It does not appear from the medical records that Brown saw Dr. Abuharaz between mid-October 2005 and mid-June 2006.  On June 19, 2006, Brown followed up with Dr. Abuharaz for medication refills.  (Tr. 350).  Treatment notes indicate that Brown had chronic back pain that was "intractable."  (*Id.*).  He was noted to have tenderness in the lumbosacral (LS) area on the right, but had no neurological deficits of the legs.  (*Id.*).  His Vicodin was refilled, and he also was placed on MS Contin.  (*Id.*).  Dr. Abuharaz's notes indicate that Brown was to return to work with restrictions on July 16, 2006.  (Tr. 350-51).

On July 13, 2006, Brown returned to Dr. Abuharaz for follow up on his back pain.  (Tr. 349).  He reported that the MS Contin did not help his pain and made him drowsy.  (*Id.*).  He was noted to have localized tenderness on the right side of his lumbar spine, and his MS Contin dose was increased.  (*Id.*).  Dr. Abuharaz's notes indicate that a work examination was scheduled to take place in two weeks, but he doubted that Brown would be able to return to work.  (*Id.*).

Brown returned to Dr. Abuharaz on July 26, 2006, requesting a referral to a neurologist.  (Tr. 348).  Dr. Abuharaz noted that Brown still had tenderness over the LS area.  (*Id.*).  He referred Brown to a neurologist in Ann Arbor and extended Brown's sick leave for four weeks.  (*Id.*).  On August 11, 2006, Brown returned to Dr. Abuharaz seeking an extension of sick leave because of his ongoing back pain.  (Tr. 347).  On September 19, 2006, Brown returned to Dr. Abuharaz.  (Tr. 346).  His MS Contin was refilled, and his sick leave was extended to October 21, 2006.  (*Id.*).  On October 19, 2006, Brown again saw Dr. Abuharaz regarding his back pain.  (Tr. 345).  Brown complained that his back pain was still severe, and that it radiated down his right leg.  (*Id.*).  He requested a refill of MS Contin, even though he said it did not relieve his

pain. (*Id.*). On examination, there was tenderness over the LS area and restriction of spinal flexion. (*Id.*). On November 20, 2006, Brown again saw Dr. Abuharaz for a refill of the MS Contin. (Tr. 344). He reported that the medication did not really help his back pain, but allowed him to sleep.[6] (*Id.*). On examination, he had tenderness over the LS area and sacroiliac joint. (*Id.*). On December 21, 2006, Brown returned to see Dr. Abuharaz, reporting that the injections had not helped his pain and seeking a medication refill and extension of his sick leave. (Tr. 441). On January 18, 2007 and February 21, 2007, Brown again saw Dr. Abuharaz for medication refills and extensions of his sick leave. (Tr. 439-40). There are no medical records indicating that Brown saw Dr. Abuharz again after February 2007, and it does not appear that he began treating with Dr. Gary Roome until mid-2008, so it is unclear whether Brown continued to see a primary care physician during the intervening period of time.[7]

### (2)   *Dr. Gary Roome and Dr. Rama Rao*

On July 23, 2008, Brown began treating with Dr. Gary Roome at Hamilton Community Health Network for his low back pain. (Tr. 505). Dr. Roome referred Brown to Dr. Rama Rao, an anesthesiologist, for a pain management evaluation. (Tr. 519). On October 2, 2008, Brown was evaluated by Dr. Rao. (Tr. 519-21). On examination, Brown had good motor strength, sensation was intact, and straight leg raising was negative. (Tr. 520). But, Brown had a decrease in lumbar spine flexion and extension and muscle spasms. (*Id.*). He underwent lumbar steroidal epidural injections and, when he followed up with Dr. Rao on January 27, 2009, it was noted that Brown had "some decrease in pain" and that he had "improved significantly." (Tr. 517). No

---

[6] A separate notation, however, indicates that Brown reported that the MS Contin "helps" and decreases his pain by 40%. (Tr. 344).

[7] On November 21, 2007, Dr. Palavali (a neurologist) issued a report to "Dr. Paul Dake," a family practitioner in Flint, Michigan, thanking Dr. Dake for referring Brown for a consultation and reporting on his findings. (Tr. 480-81). It appears, then, that Brown may have treated with Dr. Dake, but there are no medical records from Dr. Dake in the file.

follow-up appointment was scheduled with Dr. Rao, and Brown was advised to follow up with Dr. Roome and to continue with physical therapy, medication, and counseling, if needed.  (*Id.*). Lumbar spine x-rays taken on January 13, 2009 were negative except for bilateral sacralization of L5.  (Tr. 516).  Brown followed up with Dr. Roome approximately once a month until the time of the hearing.

On June 9, 2009, Dr. Roome testified under oath that it was his opinion that Brown was disabled due to chronic lumbar changes and chronic low back pain.  (Tr. 522-29).  Dr. Roome further testified that he had been treating Brown for approximately one year at the time, and that he had reviewed "numerous" medical records pertaining to Brown's treatment before that time. (Tr. 524).  According to Dr. Roome, Brown has "chronic lumbar spine changes on x-ray" that persisted after surgery that "will only get worse."  (Tr. 526).  Dr. Roome further testified:

> . . . [Brown] has chronic daily low back pain, some radiculopathy or pain down into the legs, and I believe the testicular pain he's developing is also due to radicular or nerve pain in the testicles.  And this pain is chronic.  It doesn't matter if he's standing, sitting, or lying down.
>
> At this point, I feel he cannot do a sitting job; he cannot do a standing job; he can't lift or twist or bend.  And I feel that his weight restriction should be actually zero pounds in lifting.

(*Id.*).  Moreover, Dr. Roome testified that Brown's complaints of severe and chronic low back pain, radiating down his leg, were consistent with the results of the April 2005 MRI (which showed changes at L5-S1 and L4-L5) and the October 2007 MRI (which showed problems at L5-S1 and "quite a bit of narrowing and hypertrophic facet disease").  (Tr. 526-27).  Lastly, Dr. Roome testified that Brown had prostate cancer in the past, which had been treated with radioactive seed implants.  (Tr. 527).  These radioactive seeds produce a chronic low dose of radiation and, according to Dr. Roome, cause or contribute to the chronic fatigue Brown experiences.  (*Id.*).

*(b)* *Specialists*

*(1)* *Dr. Culver*

Brown treated with Dr. James Culver at the Pain Management Center of Flint from September 2005 through October 2005 for lower back pain management. (Tr. 221-37). On September 23, 2005, Brown described his low back pain as "aching, tightness, muscle spasms, hot, burning and dull pain" that became worse with standing, walking, prolonged sitting, and other physical activities. (Tr. 227). Brown indicated that he had had some partial improvement in the past with a TENS unit, heat, bed rest and physical therapy; overall, however, he had "really not made much progress." (*Id.*).

On examination, Dr. Culver noted that Brown walked "quite stiffly" and that lumbar mobility was reduced to both flexion and extension. (Tr. 228). Dr. Culver believed that Brown's signs and symptoms were consistent with degenerative disc disease with disc osteophyte complexes and stenosis, resulting in low back pain syndrome. (Tr. 222). His plan was to treat Brown with a series of caudal epidural injections. (*Id.*). Brown received four injections from Dr. Culver between September 23, 2005 and October 14, 2005, but he did not notice any overall improvement. (Tr. 221-22, 230).

*(2)* *Dr. Palavali*

Brown was referred to Dr. Vivekanand Palavali at the Great Lakes Spine Center in May 2005. (Tr. 282). He reported that his back pain started approximately one year before while at work. (*Id.*). On May 3, 2005, Brown reported that despite physical therapy and anti-inflammatory medications, his low back pain was "gradually worsening." (*Id.*). The pain bothered him significantly and was worse with prolonged sitting, bending, or twisting. (*Id.*). A neurological examination revealed negative straight leg raise testing, normal strength, normal

12

reflexes, normal sensation and a normal gait.  (*Id.*).  He did have limited lumbar flexion, and a lumbar MRI showed mild disc degeneration at L5-S1 and small disc prolapse without any retrolisthesis.  (Tr. 283).  Dr. Palavali advised Brown to finish his course of physical therapy and continue his exercise program; if that did not decrease his pain, Dr. Palavali would reevaluate him to see if there was any role for surgery.  (*Id.*).

Brown saw Dr. Palavali again on October 18, 2005.  (Tr. 281).  He reported that neither physical therapy nor Dr. Culver's injections had helped his pain.  (*Id.*).  A lumbar discogram was planned to evaluate for possible surgery.  (*Id.*).  On October 26, 2005, Brown met with Dr. Palavali to discuss the results of his discogram.  (Tr. 280).  Dr. Palavali indicated that major surgery (such as a fusion) was not an option, but he recommended an IDET procedure, which he performed on November 11, 2005.  (Tr. 280, 369-71).

On November 29, 2005, Brown followed up with Dr. Palavali.  (Tr. 279).  At that time, Brown had no leg pain and had cut down on his pain medication.  (*Id.*).  Dr. Palavali indicated that he would see Brown again in ten weeks, at which point physical therapy would begin.  (*Id.*).

On February 15, 2006, Brown saw Dr. Palavali for a follow-up visit.  (Tr. 278).  Brown still had "significant back pain," and Dr. Palavali noted that he sits "leaning to one side and walks guarding his lower back."  (*Id.*).  Dr. Palavali advised Brown that it was time to remove his back brace and begin physical therapy.  (*Id.*).  He would see Brown again after he completed physical therapy.  (*Id.*).

On April 18, 2006, Brown saw Dr. Palavali for a follow-up visit.  (Tr. 277).  At that time, Brown had some persistent pain, but was better than before and was able to walk straight and increase his activity.  (*Id.*).  Dr. Palavali encouraged Brown to do his exercises regularly and gradually decrease the Vicodin, saying that he would see him again in three months and, at that

time, determine if he could return to work.  (*Id.*).

On June 1, 2006, Brown had another MRI of the lumbar spine.  (Tr. 284).  The MRI showed diffuse bulging of the disc with protrusion/herniation centrally and to the right, but no significant central spinal stenosis was seen.  (*Id.*).  On June 6, 2006, Brown saw Dr. Palavali for a follow-up visit.  (Tr. 276).  According to Dr. Palavali, Brown's MRI showed no disc prolapse or significant disc degeneration.  (*Id.*).  Dr. Palavali told Brown that there were no surgical options at that time, and that he should return to work with some restrictions and increase his activity.  (*Id.*).  Brown reported that he still had some lower back discomfort with activity, and Dr. Palavali indicated that "with maintaining exercises at home that should get better."  (*Id.*).  In the alternative, Brown was told that he could obtain a second opinion at the University of Michigan.  (*Id.*).  According to Dr. Palavali, Brown wanted "to consider going back to work in the next two to three weeks."  (*Id.*).

More than a year later, on November 21, 2007, Brown was again seen by Dr. Palavali for his back pain and complaints of leg pain.  (Tr. 480).  According to Brown, the pain was worsening, and he had some tingling and numbness, but no weakness.  (*Id.*).  Another MRI of Brown's lumbar spine had been performed on October 24, 2007, which, according to Dr. Palavali, showed a small disc prolapse with nerve root compromise on the right side at L5-S1, as well as mild stenosis.  (Tr. 464-65, 480).  A neurological examination was positive for straight leg raising.  (*Id.*).  Dr. Palavali felt that Brown had clinical findings of right S1 radiculopathy, but the pathology did not appear to be significant.  (Tr. 481).  On November 29, 2007, Brown underwent a lumbar myelogram, which showed a bulging disc at L4-S1, with some partial nerve root compression.  (Tr. 482-83).

*(3)      University of Michigan*

On April 12, 2005, Brown was seen by Dr. Deborah Heaney at the University of Michigan Hospital ("UM").  (Tr. 429-30).  She noted that Brown was first seen at UM in November of 2003 for "low back pain that had begun insidiously over a 2-month period prior to his being seen."  (Tr. 429).  Brown reported at the time that the bumpiness of forklift driving contributed to his pain.  (*Id.*).  He was diagnosed with non-specific back pain and physical therapy was recommended.  (*Id.*).  Brown alleged that the pain never resolved, but he continued to work until he woke up on March 28, 2005 with severe back pain that left him bedridden for days.[8]  (*Id.*).  After examining Brown, Dr. Heaney concluded that he was suffering from chronic back pain of unknown etiology, and she referred him to his primary care physician.  (Tr. 430).  She took him off work because he was taking prescribed narcotics and to rule out other medical conditions.  (*Id.*).

On May 5, 2005, Brown was seen by Dr. Victor Roth at UM because of complaints of low back pain.  (Tr. 388).  Dr. Roth noted that Brown had been followed by his primary care physician for a non-occupational low back condition and had not worked since April 3, 2005.  (*Id.*).  Brown was undergoing physical therapy at the time.  (*Id.*).  His primary care doctor had written a note without seeing him, indicating that he could return to work on May 3, 2005, but Brown did not feel he could do so due to continued low back pain and because his job required significant lifting, bending, and twisting.  (*Id.*).

On examination, Dr. Roth noted that palpation along the lumbosacral spine "revealed discomfort appearing out of proportion to the light touch applied by the examiner."  (*Id.*).  Brown's straight leg raise testing was negative and his motor/sensory in the lower extremities

---

[8] Dr. Heaney noted that Brown's report to her varied from a report he provided to his employer (that he had injured his back lifting a heavy suitcase on Easter).  (*Id.*).

was normal, but his gait was slow and he had limited range of motion at the waist (which varied with each attempt). (*Id.*). Dr. Roth assessed non-occupational low back pain and "likely element of symptom magnification." (*Id.*). However, Dr. Roth indicated that Brown was not capable of returning to his job, and he was advised to follow up with his primary care physician. (*Id.*).

On September 6, 2006, Brown returned to UM, where he saw Dr. Hsinlin Cheng, a neurologist. (Tr. 389-90). On examination, Brown had tenderness along the bilateral sacral areas, but his straight leg raise testing was negative. (Tr. 390). He walked with pain and with a narrow based gait. (*Id.*). Dr. Cheng's impression was that Brown's pain was the combination of soft tissue nociceptive pain with some neuropathic sacral components. (*Id.*). He placed Brown on Nortriptyline and a Lidoderm patch, recommended that he continue physical therapy, and referred him to UM's spine program. (*Id.*). Dr. Cheng also talked to Brown about acupuncture as a tentative approach to treat his pain, and advised Brown to follow up in one month. (*Id.*).

On October 10, 2006, Brown returned to see Dr. Cheng. (Tr. 391-92). Brown reported that his pain was not improving with the new treatments. (Tr. 391). On examination, Brown had tenderness along the SI joint on the right side. (*Id.*). He had a positive FABER and Gaenslen test, which induced severe pain. (*Id.*). His straight leg raise testing was negative. (*Id.*). Dr. Cheng felt that Brown's pain, which was not responding to the neuropathic pain regimens, likely resulted from soft tissue inflammation. (*Id.*). As a result, Dr. Cheng referred Brown to UM's Pain Clinic, thinking that he might benefit from a sacroiliac joint injection. (*Id.*).

On November 16, 2006, Brown was seen at UM's Pain Clinic by Dr. Glen Gehrke and Dr. Jasveer Grewal. (Tr. 393-96). Brown reported dull, burning pain mostly located over the right lower lumbar region, encompassing his right gluteal region, which was a 9/10 on the pain scale. (Tr. 393). Brown reported having had physical therapy with little relief, caudal steroidal

16

injections with no relief, and an IDET procedure with two days of pain relief.  (*Id.*).

On examination, Brown was noted to have an antalgic gait, and he complained of tenderness over the right SI joint, posterosuperior iliac spine, lower lumbar region on the right side, and paraspinal with diffuse pain in the entire region.  (Tr. 395).  The doctors noted that when placed in the left lateral decubitus position, however, Brown did not exhibit similar symptoms.  (*Id.*).  Straight leg raise testing was negative, his sensation was intact, and the physician noted that Brown's "pain appears out of proportion to examination findings."  (*Id.*).  He was assessed with right sacroiliac joint dysfunction versus lumbar facet arthropathy.  (*Id.*).  He was scheduled to undergo a right-sided sacroiliac injection and to be evaluated by a pain psychologist.  (*Id.*).  On December 1, 2006, Brown underwent the right-sided sacroiliac injection.  (Tr. 396-97).

On January 26, 2007, Brown was reevaluated at UM's Pain Clinic by Dr. Gehrke and Kevin Cuccaro, D.O.  (Tr. 417-18).  Records note that Brown had not seen the pain psychologist.  (Tr. 417).  He reported that his pain remained in the right low back region, with pain radiating down the posterior right leg into the right heel.  (*Id.*).  After conducting a physical examination of Brown, the physicians stated:  "The patient exhibited excessive pain behaviors in contrast to his physical exam."  (Tr. 418).  No further treatment or interventions were recommended, but Brown was again advised to follow up with the pain psychologist.  (*Id.*).

(c)     <em>Residual Functional Capacity Assessment</em>

On December 26, 2006, a residual functional capacity ("RFC") assessment was conducted.  (Tr. 409-16).  Terri Gillies, a state agency medical consultant, examined Brown's medical records and concluded that he retained the ability to perform light work activities with occasional climbing, balancing, stooping, kneeling, crouching and crawling, with no other

17

postural limitations.  (Tr. 411).

### 4.    Vocational Expert's Testimony

Edward Pagella testified at the hearing as an independent vocational expert ("VE").  (Tr. 61-64).  The VE testified that Brown's past relevant work as a material handler was semi-skilled in nature, and at a medium level of physical exertion.  (Tr. 62).  The ALJ asked the VE to imagine a claimant of Brown's age, education, and work experience, who would be limited to light work involving only occasional climbing, balancing, stooping, kneeling, crouching and crawling.  (Tr. 63).  The VE apparently testified that such an individual would not be capable of performing Brown's past relevant work.[9]  (Id.).  However, the VE testified that the hypothetical individual would be capable of working in several unskilled, entry-level jobs, such as cashier (16,000 jobs), hand sorter (6,200 jobs), and hand packer (9,800 jobs).  (Tr. 63-64).  In total, the VE testified that there are 360,000 light, unskilled jobs and 240,000 sedentary, unskilled jobs in the state of Michigan that the hypothetical individual could perform.  (Tr. 64).  However, the VE also testified that, assuming that Brown is "totally credible and all his impairments are supported by the medical evidence," there are no jobs in the national economy that he could perform.  (Id.).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

---

[9] The VE's testimony is response to this hypothetical question is reflected as "inaudible" in the hearing transcript, but there is no dispute that the VE concluded Brown could not perform his past relevant work as a material handler.  (Doc. #8 at 9; Tr. 33).

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331 (E.D. Mich. Dec. 6, 2011), *citing* 20 C.F.R. §§404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.    The ALJ's Findings**

Following the five-step sequential analysis, the ALJ, in a detailed and lengthy written decision, found that Brown is not disabled under the Act.  (Tr. 23-34).  At Step One, the ALJ found that Brown has not engaged in substantial gainful activity since April 1, 2005, his alleged onset date.  (Tr. 25).  At Step Two, the ALJ found that Brown has the severe impairment of

degenerative disc disease and the non-severe impairment of prostate cancer.  (*Id.*).  At Step Three, the ALJ found that Brown's impairments do not meet or medically equal a listed impairment.  (Tr. 26).  The ALJ then assessed Brown's RFC, finding that he is capable of performing light work, as defined in 20 C.F.R. §404.1567(b) and 416.967(b), except that he has the ability to occasionally climb, balance, stoop, kneel, crouch and crawl.  (*Id.*).  At Step Four, the ALJ determined that Brown cannot do his past relevant work, which was medium in exertion and semi-skilled in nature.  (Tr. 33).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Brown is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 33-34).  As a result, the ALJ concluded that Brown is not disabled under the Act.  (Tr. 34).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Brown argues that the ALJ failed to properly recognize the intensity, persistence and limiting effects of his conditions.  He also argues that the ALJ erred in providing the VE with a hypothetical that failed to include the functional limitations resulting from his pain.  And, finally,

Brown argues that the ALJ erred in failing to give proper weight to the opinion of Dr. Gary Roome, one of his treating physicians.

1.      The Opinions of Brown's Treating Physician

Brown argues that the ALJ improperly declined to give any weight to the opinion of his treating physician, Dr. Gary Roome.  In his opinion, the ALJ indicated that he did not have to give consideration to Dr. Roome's opinion that Brown was disabled because this opinion was on the "ultimate issue of disability" and, therefore, was reserved to the ALJ.  (Tr. 32).  Brown argues that even if the ALJ was free to disregard Dr. Roome's opinion on this ultimate issue, he committed legal error in failing to address Dr. Roome's medical opinion as to Brown's functional limitations, as supported by objective medical evidence.  (Doc. #8 at 21-22).  The court finds merit to Brown's argument.

In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole.  *See* 20 C.F.R. §404.1527(d)(2)-(6).  Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source, and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time.  *See* 20 C.F.R. §404.1527(d)(1)-(2).  In fact, an ALJ must give the opinion of a treating source controlling weight if he finds it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §416.927(c)(2).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits."  *Clement v. Comm'r of Soc. Sec.*, 2012 WL 313750 (E.D. Mich. Feb. 1, 2012), *quoting Smith v. Comm'r of Soc. Sec.*,

22

482 F.3d 873, 875 (6th Cir. 2007).  Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight."  *Clement*, 2012 WL 313750 at *2 (internal citations omitted).  Moreover, a "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Id.*, *citing Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

In this case, the ALJ was legally correct in stating that Dr. Roome's opinion was not conclusive on the issue of disability, as this is an issue reserved to the Commissioner.  *See* 20 C.F.R. §404.1527(d)(2).  However, the ALJ did not give good reasons for entirely discounting the remainder of Dr. Roome's opinion regarding Brown's functional limitations.

Dr. Roome testified that he had been treating Brown for approximately one year at the time he rendered the medical opinions at issue.  (Tr. 524).  Not only was Dr. Roome familiar with Brown's symptoms and treatment during the one-year period of time preceding the hearing, but he testified that he had also had reviewed "numerous" medical records pertaining to Brown's treatment before 2008.  (*Id.*).  The record evidence indicates that Dr. Roome was Brown's treating physician since mid-2008, and between that time and the time of the hearing (in June 2009), there is no indication that Brown treated with – or consulted with – any other physicians.

Even setting aside Dr. Roome's conclusion on the ultimate issue of disability, he testified under oath as to Brown's symptoms, conditions, and treatment, all of which the ALJ appears not to have addressed.  For example, Dr. Roome testified that Brown suffered from chronic lumbar

23

spine changes and chronic low back pain with radiculopathy. (Tr. 525-26). According to Dr. Roome, Brown has "chronic lumbar spine changes on x-ray" that persisted after surgery that "will only get worse." (Tr. 526). Dr. Roome further testified:

> . . . [Brown] has chronic daily low back pain, some radiculopathy or pain down into the legs, and I believe the testicular pain he's developing is also due to radicular or nerve pain in the testicles. And this pain is chronic. It doesn't matter if he's standing, sitting, or lying down.
>
> At this point, I feel he cannot do a sitting job; he cannot do a standing job; he can't lift or twist or bend. And I feel that his weight restriction should be actually zero pounds in lifting.

(*Id.*).

Given Dr. Roome's treatment history with Brown, as well as the fact that his opinions are supported by at least some objective medical evidence, the ALJ should have discussed whether his opinions were sufficiently supported "by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record" so as to impact Brown's RFC. 20 C.F.R. §416.927(c)(2). Dr. Roome testified that Brown's complaints of severe and chronic low back pain, radiating down his leg, were consistent with the results of the April 2005 MRI (which showed changes at L5-S1 and L4-L5) and the October 2007 MRI (which showed problems at L5-S1 and "quite a bit of narrowing and hypertrophic facet disease"). (Tr. 526-27). Brown received a series of epidural shots at the Pain Management Center in 2005. (Tr. 454). He had an IDET procedure in November of 2005. (Tr. 369-71). In 2006, he was referred to UM's Pain Clinic, where he was assessed with right sacroiliac joint dysfunction versus lumbar facet arthopathy. (Tr. 395). On December 1, 2006, he underwent a right-sided sacroiliac injection at UM. (Tr. 396-97). On November 29, 2007, Brown underwent a lumbar myelogram, which showed a bulging disc at L4-S1, with some partial nerve root compression. (Tr. 482-83). It was Dr. Roome who referred Brown to Dr. Rao,

an anesthesiologist, for a pain management evaluation in the Fall of 2008.  (Tr. 519-21).  And, as a result, Brown underwent lumbar steroidal injections in 2008.  (Tr. 519-21).  For years, Brown has been prescribed narcotics in an effort to manage his back pain.  All of this evidence is in the record, and is consistent with Dr. Roome's medical opinions regarding Brown's functional limitations.

Although the ALJ's decision was detailed and thorough in many respects, it failed to properly address Dr. Roome's opinions on Brown's functional limitations.  Rather, the ALJ's opinion indicates that he rejected Dr. Roome's testimony for three purely speculative reasons: (1) it was "possible" that Dr. Roome believed only that Brown could not return to his past work as a material handler; (2) the "possibility" existed that Dr. Roome was expressing an opinion "in an effort to assist a patient" with whom he sympathized; and (3) it was possible that Brown was "insistent and demanding," and Dr. Roome was seeking to "avoid unnecessary doctor/patient tension."  (Tr. 32).  However, there is no evidence in the record that any of these "possibilities" were reality, and, to the contrary, as shown above, Dr. Roome's opinions are supported by at least some objective medical evidence in the record.

At the same time, the ALJ declined to give controlling weight to the medical opinions of Brown's treating physician, he accorded "significant weight" to the RFC assessment completed years earlier on December 26, 2006.  (Tr. 32).  In doing so, the ALJ noted that, after a review of the record, "[t]he State Agency physician concluded that the claimant retained the ability to perform light work activities with occasionally climbing, balancing, stooping, kneeling, crouching and crawling with no other postural limitations."  (*Id.*).  As the Commissioner responsibly pointed out, however, the ALJ incorrectly attributed the opinion contained in the RFC assessment to a physician when, in fact, it was a layperson who completed the form.  (Doc.

25

#11 at 7-8).  Moreover, that layperson did not examine Brown but, rather, merely reviewed his records.  (Tr. 32).  And, the RFC assessment was completed in 2006, prior to the October 2007 MRI and the November 2007 lumbar myelogram, both of which showed objective clinical evidence further supporting Brown's allegations of pain and his treating physician's medical opinions which were given no weight.  (Tr. 464-65, 482-83).

Courts have recognized that, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (internal citations omitted). Here, the ALJ summarily rejected Dr. Roome's functional limitation medical opinions which were supported by objective medical evidence in favor of an RFC assessment completed by a non-physician who lacked some of the most relevant medical evidence.  The ALJ failed to articulate specific reasons, supported by substantial evidence in the record, for such a rejection, which violated the Agency's own regulations.  For these reasons, the case should be remanded[10]; any other result "would afford the Commissioner the ability [to] violate the regulation[s] with impunity and render the protections promised therein illusory."  *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011) (internal citations omitted).

2.    *Brown's Credibility*

Brown makes two additional arguments on appeal – first, that the ALJ erred in concluding that his statements concerning the intensity, persistence and limiting effects of his symptoms were not credible, and, second, that, as a result, the ALJ erred in failing to include

---

[10] The overall evidence is not so overwhelmingly in Brown's favor that an award of benefits is appropriate at this time.  Instead, it is appropriate to allow the ALJ to properly bring his expertise to bear on the ultimate issue of Brown's potential entitlement to benefits.  *INS v. Ventura*, 537 U.S. 12, 16-17 (2002).

certain functional limitations in the hypothetical question he posed to the VE.

In his opinion, the ALJ concluded that, although Brown's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his "statements concerning the intensity, persistence and limiting effects of those symptoms are not credible…." (Tr. 31).  In reaching this conclusion, the ALJ pointed out that Brown's own description of his activities of daily living was at odds with his complaints of disabling symptoms and limitations. (*Id.*).  The ALJ also noted that several physicians had expressed concerns to some degree that Brown was exaggerating his symptoms.  (*Id.*).  These facts – along with evidence that Brown had purportedly been medication-free for periods of time, had received a "normal" total body scan on July 1, 2005, and had made no mention of alleged disabling back pain at a urology examination on May 31, 2005 – caused the ALJ to conclude that Brown "has exaggerated symptoms and limitations."[11]  (Tr. 31-32).  As a result of this credibility determination, presumably, the ALJ discounted Brown's testimony that he needed to lie down during the day and could not lift more than a few pounds in forming his hypothetical question to the VE.  (Tr. 63-64).

The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to his credibility.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus, an ALJ's credibility determination will not be

---

[11] In reality, however, the "evidence" cited by the ALJ in support of his conclusion that there were "significant periods" when Brown was not taking medication consists of Exhibits 10F and 13F.  (Tr. 31).  These are generic references to UM records and do not appear to support a conclusion that Brown was medication-free for "significant periods" during the time in question. (Tr. 384-97, 417-35).  Moreover, Brown's visit to the urologist on May 31, 2005, a follow-up to an emergency room visit, involved suspected prostate cancer – with which Brown was subsequently diagnosed – and it is hardly surprising, or relevant to the instant analysis, that Brown failed to mention his back pain when discussing urinary symptoms with a urologist.  (Tr. 295-96).  Similarly, the total body scan – performed because Brown had been recently diagnosed with prostate cancer – was designed to determine whether the cancer had metastasized into Brown's bones, not to look for objective evidence of back pain.  (Tr. 332).

27

disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Moreover, "an ALJ is only required to pose those hypothetical limitations that she finds credible." *Burbo v. Comm'r of Soc. Sec.*, No. 10-2016, 2011 U.S. App. LEXIS 26143 (6th Cir. Sept. 21, 2011), *citing Stanly v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994).

In this case, however, after examining the record evidence, especially in light of the ALJ's outright disregard of Dr. Roome's opinion regarding Brown's condition, it is not clear to this court that substantial evidence supports the ALJ's finding that Brown's testimony regarding his level of pain was not credible.  For example, as noted above, the objective medical evidence shows that Brown underwent multiple series of injections and an IDET procedure, and has taken pain medication virtually continuously since 2005.  Moreover, after Brown was diagnosed with prostate cancer, he was treated with radioactive seed implants, which produce a chronic low dose of radiation and, according to Dr. Roome, cause or contribute to the chronic fatigue that Brown feels.  (Tr. 527).  On remand, the ALJ should reconsider his assessment of Brown's testimony that he needs to lie down throughout the course of the day and regarding his level of pain, particularly in light of his treating physician's medical opinions discussed above, and determine the extent to which they should be incorporated into the hypothetical ultimately put to the VE.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [11] be DENIED, Brown's Motion for Summary Judgment [8] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

Dated: June 20, 2012               s/David R. Grand
Ann Arbor, Michigan           DAVID R. GRAND
                                   United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 20, 2012.

                             s/Felicia M. Moses
                             FELICIA M. MOSES
                             Case Manager